# WHEELING.

STATE v. PORTER AND SHAVER.

Submitted January 23, 1885.—Decided April 1, 1885.

An indictment for conspiracy and the felonious taking and carrying away of personal property, under section ten chapter one hundred and thirty-five of the Acts of 1882, known as the "Red Men's Act," is not sustained by the proof that the property was obtained by false pretenses with the owner's consent and without force or threats. The taking contemplated by said act is by physical force or against the owner's consent.

A statement of the facts of the case appears in the opinion of the Court.

*Malcolm Jackson* and *McCorkle & McCorkle* for plaintiffs in error.

SNYDER, JUDGE:

Writ of error to a judgment rendered by the circuit court of Kanawha county, April 9, 1884, upon an indictment against Wash. Porter and Julius Shaver, the plaintiffs in error. The indictment charges, that the said Porter and Shaver feloniously and unlawfully intending to injure and defraud William Anderson and deprive him of his property, feloniously and unlawfully did combine and conspire with each other, on February 23, 1884, " for the purpose of stealing, taking and carrying away the following personal prop-

erty not their own," to-wit: One treasury-note, one green-back-note, one bank-note and one silver-certificate, each of the currency of the United States of the denomination of $10.00 and of the value of $10.00, of the goods and money of said William Anderson; and the said Porter and Shaver in pursuance of such combination and conspiracy the said several notes of the denomination and value aforesaid of the goods and money of said Anderson and not the goods and money of said Porter and Shaver or either of them "then and there being found, then and there feloniously did steal, take and carry away against," &c.

The verdict of the jury is in these words: " We, the jury, find the defendants, Wash Porter and Julius Shaver, guilty of felony as charged in the within indictment." The court sentenced the accused to confinement in the penitentiary for the term of three years.

On the trial the State proved the following facts: William Anderson, a boy about eight years old, found on the street in the city of Charleston in Kanawha county February 24, 1884, one ten-dollar greenback-note and one ten-dollar silver certificate, both of the currency of the United States, wrapped in a small sack; that the defendant, Shaver, saw the boy pick up the money, and he showed it to Shaver, who told him to take it home; that afterwards, while the boy was on his way home in another part of the city he was accosted by Porter, the other defendant, who took from the boy the sack and both notes and took out the silver-certificate and kept it; he then went home with the boy and delivered the sack with the other note in it to William Anderson, Sr., whom he told he had kept some ladies from taking the money from the boy, for which said Anderson, Sr., the father of the boy, thanked him; that the boy testified that at the time Porter came to him on the street he saw Shaver looking at him and Porter; that two or three hours after during the evening of the same day both the defendants met one Kinny on the street and started with him to the house of Anderson, Sr., and on the way they told Kinney they had some work for him to do, for which they would pay him $1.50, and explained what they wanted as follows: All three should go out to Anderson's house, the defendants should declare that the note, which had

been delivered to Anderson, belonged to Kinney, and Shaver had seen him drop it, to which statement Kinney was to assent in the presence of Anderson, and by this means the defendants should get the note, which Anderson then had, and pay Kinney $1.50. Kinney agreed to this; and he and the defendants went to Anderson's house together, and Shaver stated to Anderson that he had seen Kinney drop the money and the boy pick it up and was willing to swear that it was Kinney's money, to which Kinney assented, and Anderson, Sr., gave Kinney the ten-dollar note, Shaver gave the boy fifty cents, and they all then left the house; that Kinney then gave Shaver the note and the defendants gave Kinney $1.50 and Shaver said in the presence of Porter and Kinney, " God, I had a hard time getting that money, but we got the other $10.00 and had to have this one," and that neither of the defendants nor Kinney had lost any such money.

These facts, it seems to me, plainly prove two separate and distinct offenses, the one the obtaining of the ten-dollar note from the boy on the street and the other the procuring of the ten-dollar note from William Anderson, Sr., at his house. The two acts occurred at different times, in different places and had reference to different notes. It does not appear that, when the first note was taken, there was any intent or purpose to take the other. If such had been the intent at that time Porter, instead of taking one and carrying the other to the house of Anderson, Sr., and delivering it to him, would have kept both notes. The only rational explanation of this conduct, is, that the defendants, assuming they were confederates in both transactions, had no intention of taking the second note at the time they got the first; but having gotten the first they entered into a seperate and distinct conspiracy to procure the second and in pursuance thereof obtained it from Anderson, Sr. This is entirely consistent with Shaver's declaration, "We got the other $10.00 and had to have this one." The two offences, being separate and unconnected, and resulting from different and distinct impulses, could not be regarded as parts of one and the same act and punished as such, but could only be prosecuted distributively and punished as separate offences. 1 Whart. Crim. Law, section 27 ; Walker's Case, 1 Leigh. 574.

The value of the money taken being in either case less than $20.00, the defendants were not guilty of felony under our statute for the punishment of larceny or for obtaining money by false pretences. The indictment as well as the verdict indicate very plainly that the prosecution was not conducted under either of said statutes, but under section 10 of chapter 135, Acts 1882, known as the "Red Men's act."

The ninth section of this act provides, that "If two or more persons under the name of 'Red Men,' 'Regulators,' 'Vigilance Committee,' or any other name or without a name combine or conspire together for the purpose of inflicting any punishment or bodily injury upon any other person or persons, or for the purpose of destroying, injuring or taking and carrying away any property real or personal not their own, every such person, whether he has done any act in pursuance of such combination or conspiracy or not, shall be guilty of a misdemeanor," &c. And the tenth section is as follows:

"10. If any person, in pursuance of such combination or conspiracy as is mentioned in the next preceding section shall inflict any punishment or bodily injury upon another person or shall destroy, injure, or take and carry away, any property, real or personal, not his own, he shall be guilty of a felony, and confined in the penitentiary not less than two nor more than ten years."

The counsel for the plaintiffs in error contend the facts proved show merely that the defendants were guilty of obtaining ten dollars by false pretences, an offence which does not come within either the letter or spirit of the aforesaid act. They insist that the languge used imports violence and force and the whole tenor of the act shows that the object and purpose of it was to suppress and punish unlawful acts of trespass such as the forcible taking and carrying away of property against the owner's will, and that it was not intended to punish the fraudulent obtaining of property with the owner's consent.

" No man incurs a penalty unless the act, which subjects him to it, is clearly both within the spirit and the letter of the statute imposing such penalty. If this rule is violated, the fate of accused persons is decided by the arbitrary discretion of judges and not by the express authority of the

law." Potter's Dwar. Stat. 241; *Fletcher* v. *Lord Sonders*, 3 Bing. 580.

This act is made a part of chapter one hundred and forty-eight of our Code, which chapter is entitled "Offences against the Peace." Its public history and the exigencies, which led to its enactment, are matters of judicial cognizance. Greenl. Ev., sections 5 and 6; *Taylor* v. *Barclay*, 2 Sim. 221; *Embry* v. *Commonwealth*, 79 Ky. 439.

It is well known, that at the time of and previous to the passage of this act there were in certain counties of the State lawless bands of men, known as "Red Men," "Regulators," "Vigilance Committees," &c., who were in the habit of inflicting punishment and bodily injury upon peaceful citizens, and injuring, carrying away and destroying their property and committing other acts of trespass of the most violent and outrageous character. It was to punish and suppress such combinations and conspiracies that the act was passed. That such was its object is shown by its very terms, by the title of the chapter of which it is made a part and by the meaning and import of the offences designated in it. The words, "inflict any punishment," "bodily injury," "destroy," and "injure," all contemplate acts of trespass; and the words, "take and carry away" though not necessarily words of trespass may be such, and when employed, as they are here with other words importing acts of trespass, it is fair and reasonable that they should also be so construed. In fact the technical meaning of these words "take and carry away" in criminal law implies a trespass and can only be supported by proof that the property was taken *against* the owner's will and not by his consent. 1 Whart. Cr. L., sections 914, 965.

These words are not new in the criminal statutes of Virginia and this State. The act of February 14, 1823, provides: "That any person, who shall knowingly and wilfully without lawful authority, * * * but not feloniously, *take and carry away* or destroy or injure any tree already cut or any other timber or *property real or personal* belonging to another shall be deemed guilty of a misdemeanor," &c. Sup. to Rev. Code, chapter 226, p. 280.

This has been uniformly construed to be a statute against

wilful *trespass. Israel's Case,* 4 Leigh. 675; *Campbell's Case,* 2 Rob. 891; *Dye's Case,* 7 Grat. 662.

An act using the same terms was in force in this State, when the act under consideration was enacted. Section 27, chapter 145, Code, p. 685.

The following act was then and still is in force in this State:

"If a person obtain by any false pretence or token from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be guilty of the larceny thereof," &c. Section 23, chapter 145, Code, p. 684. .

This and section twenty-seven are parts of the same chapter. The grade of the crime for the violation of section twenty-three is a felony or misdemeanor accordingly as the value of the property obtained is $20.00 or less, while the grade under section twenty-seven never exceeds that of misdemeanor in any case. The latter section uses the words "take and carry away;" then, if a conviction may be had upon an indictment under this section by proof, that the property taken and carried away was obtained by false pretences, the offence may be punished under either of said sections and it may be made a misdemeanor or a felony at the option of the prosecutor or the grand jury. The result is still more anomalous, if we apply the same test to the same words in the statute now in question. The defendants under the latter statute would be guilty of felony, while if they had been prosecuted under said section twenty-three of the Code they would not be guilty of felony but only of a misdemeanor.

The chapter of the Code containing said sections twenty-three and twenty-seven and other similar provisions is entitled "Offences against Property," while as we have seen the one of which the "Red Men's Act" is made a part, is entitled "Offences against the Peace." This of itself indicates that the two chapters were intended to punish different classes of offences—the former violations of the rights of property and the latter violations of the public peace, trespasses and acts of violence.

If the latter act has no other object than to protect persons and property against wrongs and injuries not pro-

duced by acts of trespass or violence, then there is no reason why the punishment declared by it should be more severe than that declared by other statutes of like character. The fact that it refers specially to combinations and conspiracies, —it does not even say they shall be unlawful—can in that case make no difference; for the danger from secret devices and peaceful frauds is lessened rather than increased by combinations and conspiracies. It is very seldom that conspiracies are formed to injure either person or property by peaceful means. The large majority of offences of that kind are committed by single individuals. It is only where force is contemplated that combinations are made or desirable. In such cases only could any reason exist for increased penalties. It is combinations to commit trespasses and do other acts of violence that we must in reason presume the legislature intended to suppress by the severe penalties denounced in the several sections of this act. This, it seems to me, is very clear from the language, history and evident purpose of this act. Reason and necessity also require such interpretation; because to hold otherwise would be to make it inconsistent with other statutes. As said by the court of appeals of Kentucky in reference to a very similar statute, "the mischief the legislature intended to provide a remedy against was the confederating and banding together of disorderly and evil disposed persons for the purpose of unlawfully and by the use of physical force or threats of force and violence overawing and injuring the persons and property of obnoxious and defenceless individuals, to the disturbance of the public tranquility and order."—*Embry* v. *Commonwealth*, 79 Ky. 439.

For the reasons aforesaid I am of opinion the judgment of the circuit court should be reversed, the verdict of the jury set aside and the case remanded for a new trial.

REVERSED.   REMANDED.